# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| GODO KAISHA IP BRIDGE 1, § § *Plaintiff*, § § v. § CIVIL ACTION NO. 2:21-CV-00213-JRG § (LEAD CASE) TELEFONAKTIEBOLAGET LM § ERICSSON, ERICSSON, INC., § § *Defendants*. § § | | |
| v. § CIVIL ACTION NO. 2:21-CV-00215-JRG § (MEMBER CASE) NOKIA CORPORATION, NOKIA § SOLUTIONS AND NETWORK OY, § NOKIA OF AMERICA CORPORATION, § § *Defendants*. § § | | |

## **ORDER**

Before the Court is Defendants Telefonaktiebolaget LM Ericsson and Ericsson Inc.'s ("Ericsson") Motion for Partial Summary Judgment that Ericson is Licensed to the '909, '724, '594, '239, and '546 Patents-in-Suit (the "Motion"). (Dkt. No. 84.) In the Motion, Ericsson moves the Court to grant summary judgment that Ericsson is licensed to U.S. Patent No. 7,372,909 (the "'909 Patent") and U.S. Patent No. 8,385,239 (the "'239 Patent") asserted by Plaintiff Godo Kaisha IP Bridge 1 ("IP Bridge") in this action.[1] Having considered the Motion, the relevant briefing, the applicable law, and having heard the parties' oral argument, the Court finds that the Motion should be and hereby is **DENIED**.

---

[1] At the pretrial conference on September 6, 2022, Ericsson and IP Bridge informed the Court that they had narrowed their disputes such that the Motion concerns only the '909 Patent and '239 Patent.

I.   **BACKGROUND**

On December 5, 2013, Ericsson and Panasonic executed a Global Patent Cross License Agreement (the "2013 GPLA").  The 2013 GPLA contained a "Perpetual License" clause, which automatically granted Ericsson a perpetual and royalty-free license to essential patents assigned by Panasonic *after* the date of last signature of the 2013 GPLA, December 5, 2013.  (Dkt. No. 84-2 at ¶ 3.4.)  The definition of "Patents" listed in the 2013 GPLA includes the following:

> "Patents" shall exclude patent claims (including claims of licensable patent applications) and like statutory rights including utility models, and invention certificates (i) which are exclusively licensed out by a Party or its Affiliate to a third party prior to the date of the last signature of this Agreement without having retained any rights allowing it to grant a license or covenant not to assert to the other Party and its Affiliates for that other Party's products, but only for as long as such exclusive license is in effect, or (ii) which a Party or its Affiliates is under a contractual obligation to assign to a third party under a binding assignment agreement duly signed prior to the date of the last signature of this Agreement even if such assignment has not yet been registered with the relevant patent offices on or prior to the date of the last signature of this Agreement.

(*Id.* at ¶ 1.22.)

Separately, and prior to the date of last signature of the 2013 GPLA, Panasonic and IP Bridge entered into a Patent Right Transfer Agreement ("PTA") transferring certain rights in patents owned by Panasonic or its subsidiary Sanyo in exchange for monetary compensation.  The PTA was executed on July 25, 2013.  (Dkt. No. 93 at 4; Dkt. No. 84-3.)  The PTA defined "Assigned Patents" as including "Patent Group 1," which encompassed a group of already-selected patents to be transferred upon execution of the PTA, and "Patent Group 2," which was defined as the "Patent group that [IP Bridge] selects from among the patent groups in Appendix B pursuant to Article 4, paragraph 2 after This Agreement is executed."  (Dkt. No. 93 at 4.)  The PTA further set forth that "Rights associated with Patent Group 2 shall be transferred from Panasonic or Sanyo to GK1 [IP Bridge] whenever a selection pursuant to Article 4, paragraph 2 is made . . . ."  (Dkt.

84-3 at Art. 2, ¶ 1.)  Article 4, paragraph 2 of the PTA states that "GK1 [IP Bridge] shall select the Assigned Patents and report them to Panasonic by November 1, 2013." (*Id.*)

On September 11, 2013, before the date it was required to report its selection to Panasonic under the terms of the PTA, IP Bridge sent a letter to Panasonic notifying Panasonic of the patents IP Bridge had selected according to Article 4, Section 2, including an attachment indicating its selection of the '909 Patent and the '239 Patent, among other patents. (Dkt. No. 84-5.)  On October 7, 2013, Panasonic sent an email to IP Bridge confirming that 1,673 of the patents that IP Bridge chose were "selected and thus included in the scope of the assignment." (Dkt. No. 111-12.) Panasonic then executed an assignment document having a schedule of U.S. Patents including the '909 Patent and the '239 Patent on January 17, 2014, which was recorded at the U.S. Patent and Trademark Office on February 3, 2014.  (Dkt. 84-6.)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Ericsson's licensing argument bears on interpretation of the 2013 GPLA.  It is not disputed that 2013 GPLA interpreted under the laws of England and Wales. (Dkt. No. 84-2 at ¶ 10; Dkt. No. 84 at 14; Dkt. No. 93 at 9.)  Contract interpretation is a question of law and may be appropriately resolved by summary judgment. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985).

Under the laws of England and Wales, courts interpreting contracts are to ascertain the objective meaning of the language which the parties have chosen to express their agreement. Wood v. Capita Ins. Servs. Ltd. [2017] UKSC 24 [10].  That meaning is assessed in light of the natural and ordinary meaning of the text, among other things.  Arnold v. Britton [2015] UKSC 36 [15].  While neither textualism nor contextualism is controlling, a court faced with a complex

agreement involving sophisticated parties is more likely to rely on textualism than contextualism. Wood at [13]. Indeed, it is difficult to depart from the natural meaning of the words used, especially in the absence of drafting errors. Arnold at [18]; MT Højgaard A/S v. E.On Climate & Renewables UK Robin Rigg East Ltd. [2017] UKSC 59 [50].

### III. DISCUSSION

IP Bridge argues that the 2013 GPLA unambiguously excluded the '909 Patent and the '239 Patent because Panasonic was "under a contractual obligation to assign to a third party under a binding assignment agreement," as recited in the exclusion clause in the 2013 GPLA. (Dkt. No. 93 at 8.) IP Bridge interprets the "binding assignment agreement" in this clause to mean the PTA between IP Bridge and Panasonic, which was signed on July 25, 2013.

IP Bridge also contends that the conveyance of the selected patents was completed as of September 11, 2013,[2] and that the execution of the assignment document on January 17, 2014 and eventual recordation at the U.S. Patent and Trademark Office on February 3, 2014 were a part of a series of ministerial tasks that had to occur to conclude its business dealings with Panasonic under the PTA. (Dkt. No. 252 at 39:13–18.) Because Ericsson agreed to and signed the 2013 GPLA on December 5, 2013, which is after the date that Panasonic became obligated to assign the Patent Group 2 patents as of September 11, 2013, IP Bridge argues that the 2013 GPLA excludes the '909 Patent and the '239 Patent, and thus Ericsson does not have a license to the '909 Patent and the '239 Patent.

Ericsson argues that the exclusion clause recited in the 2013 GPLA does not apply to the '909 Patent and the '239 Patent because "under the express text, the only 'binding assignment

---

[2] Although IP Bridge argues that it was granted equitable rights in the relevant patents as of its selection on September 11, 2013, and that legal title followed as of the January 17, 2014 execution of the formal assignment document, the Court need not address the distinction between equitable and legal rights because the plain text of the exclusion clause requires no such distinction.

agreement' for the [patents] was 'duly signed' on January 17, 2014—after the December 5, 2013 signing of the 2013 GPLA." (Dkt. No. 84 at 15.) Ericsson interprets the "binding assignment agreement" in the exclusion clause to mean the formal assignment document executed on January 17, 2014. According to Ericsson, triggering the exclusion clause requires at least two separate things: (i) a contractual obligation to assign; and (ii) a binding assignment agreement.[3] At oral argument, Ericsson's counsel argued that the exclusion clause requires one of those two things to be "duly signed," and that the context of the 2013 GPLA makes clear that it is the "binding assignment agreement." (Dkt. No. 252 at 25:22–26:2.) Even if there was a "contractual obligation to assign" the patents-in-suit by virtue of the PTA signed on July 25, 2013, Ericsson argues that the exclusion clause is not triggered for the '909 Patent and the '239 Patent because the "binding assignment agreement," i.e., the formal assignment document executed by Panasonic, was not "duly signed" until January 17, 2014, which is after the date of last signature of the 2013 GPLA (December 5, 2013). (Dkt. No. 84 at 15.)

After reviewing the operative language of the 2013 GPLA, the Court is persuaded that the '909 Patent and the '239 Patent are encompassed by the exclusion clause based on the natural meaning of the words used in the 2013 GPLA. The exclusion clause encompasses patents:

> which a Party or its Affiliates is under a contractual obligation to assign to a third party under a binding assignment agreement duly signed prior to the date of the last signature of this Agreement even if such assignment has not yet been registered with the relevant patent offices on or prior to the date of the last signature of this Agreement.

(Dkt. No. 84-2 at ¶ 1.22.) Under a natural reading of this clause, the Court agrees with IP Bridge that Panasonic was under a "contractual obligation to assign to a third party" certain patents by

---

[3] According to Ericsson's interpretation, "such assignment" refers to the "binding assignment agreement." Thus, under Ericsson's interpretation, a third item (the assignment itself) might be required if the "binding assignment agreement" is an agreement to assign and not a present-tense assignment.

5

virtue of the PLA, which was "duly signed" on July 25, 2013, well before the December 3, 2013 date on which the last signature was added to the 2013 GPLA.

Further, the PTA states that "Rights associated with Patent Group 2 shall be transferred from Panasonic or Sanyo to GK1 [IP Bridge] **whenever** a selection pursuant to Article 4, Paragraph 2 is made . . . ." (Dkt. No. 84-3 at Art. 2, ¶ 1 (emphasis added).) Although Ericsson argues that IP Bridge's selection of patents was "in flux" as of the September 11, 2013 communication to Panasonic (Dkt. No. 252 at 46:2–11; *see also* Dkt. No. 111 at 3 n.3), it is clear that Panasonic's transfer to IP Bridge of the '909 Patent and the '239 Patent was not in question as least as early as October 7, 2013, which still precedes the November 1, 2013 deadline for IP Bridge to make its selection and the December 5, 2013 date of signature of the 2013 GPLA.[4] (Dkt. No. 111-12.) In any event, Ericsson has not met its burden to show there is no genuine issue as to the transfer of the '909 Patent and the '239 Patent from Panasonic to IP Bridge prior to the December 5, 2013 critical date. Therefore, Ericsson is not entitled to summary judgment.

IV. **CONCLUSION**

For the foregoing reasons, Ericsson's Motion for Partial Summary Judgment that Ericson is Licensed to the '909, '724, '594, '239, and '546 Patents-in-Suit (Dkt. No. 84) is **DENIED**.

**So Ordered this**
**Sep 9, 2022**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[4] Panasonic's October 7, 2013 email to IP Bridge states that due to a prior contractual arrangement relating to the selling off of Sanyo Electric's semiconductor business, two of the items among the list of over 1,500 patents selected by IP Bridge unrelated to LTE would be excluded from the scope of the assignment. 73 items corresponding to national phase applications and divisional applications of already-selected items were added.